UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
AT LOUISVILLE

WINCAN AMERICA, INC. PLAINTIFF

v. CIVIL ACTION NO. 3:09CV-103-S

ENVIROSIGHT, LLC, et al. DEFENDANTS

## MEMORANDUM OPINION

This matter came before the court for hearing on March 13, 2009 on motion of the defendant/counterclaimant, CD Lab AG Multimedia Systems, for a temporary restraining order and preliminary injunction (DN 19). CD Lab moved for an order restraining WinCan America, Inc., its former distributor, from using the "WINCAN"and "WINCAN AMERICA" trademarks in connection with the sale of its competing product. WinCan America indicated that it was not and would not use the stand-alone term "WINCAN" except to sell and service CD Lab's WinCan v-7 and WinCan v-8 products.[1]

Despite WinCan America's registration of the "WINCAN" and "WINCAN AMERICA" marks with the United States Patent and Trademark Office, the court found that CD Lab had made a substantial showing that WinCan America had not gained protectable rights in the "WINCAN" mark over CD Lab, the owner/manufacturer of the trademarked products. The court explained the basis for its ruling in some detail on the record. The court found the issue with respect to the mark

---

[1] Although WinCan America is no longer an authorized distributor of WinCan products, it was required to fulfill existing contracts for the purchase of WinCan products and to provide support and service for those products. WinCan America has received shipments of the products from CD Lab for this purpose, and WinCan America has acknowledged its obligations in this regard.

"WINCAN AMERICA" which had been used exclusively by WinCan America, Inc. as its trade name had not been addressed in the briefs. CD Lab had never itself used "WINCAN AMERICA" in the United States. In this regard, the court stated in its post-hearing order:

> The court noted that CD Lab had shown a likelihood of success on the merits as to the ownership of the "WINCAN" mark, but that it had never used the "WINCAN AMERICA" mark in the United States. The "WINCAN AMERICA" mark has been used exclusively by WinCan America, Inc. in connection with its sales and service business and not with any product. The parties did not address in their briefs the issue of whether WinCan America, Inc. may be enjoined from using the word "WINCAN" in the identification of its business and of its own products as part of the "WINCAN AMERICA" mark. In light of the foregoing findings, the court indicated that it would reserve ruling on the motion for injunctive relief until the parties filed briefs addressing the last issue.

Memorandum of Hearing and Order, p. 1-2.

The parties have now fully briefed this additional issue.[2,3]

First, we note that the factual determination concerning the purported agreement to assign the trademark registrations to CD Lab is equally applicable to both the "WINCAN" and "WINCAN AMERICA" marks. The court found a likelihood that CD Lab would succeed on the merits in establishing itself as the owner of the "WINCAN" mark on the basis that

> CD Lab and WinCan engaged in some letter writing in January of 2008, apparently in connection with some potential transaction to sell the [sic] WINCAN AMERICA, a transaction which was never completed. But in this letter, which of course does not by the way mention any such sale, but in that WinCan America acknowledges CD Lab's request...And we agree–and this is the language–WinCan America agrees to transfer the trademarks, WinCan and WinCan America, as soon as legally possible and understands that CD Lab will reimburse WinCan America for the full cost of the registration procedure. That does not appear to be a conditional promise but an unconditional agreement to transfer. In any case, the response from CD Lab is also

---

[2] The motion of CD Lab for leave to file an amended declaration (DN 35), the motion of WinCan America, Inc. for leave to file a sur-reply (DN 37), the motion of CD Lab for leave to file an additional declaration (DN 38), and the motion of WinCan America, Inc. for leave to file a second sur-reply (DN 39) are **GRANTED.**

[3] WinCan America has provided additional briefing on the issue of the ownership of the marks, including "WINCAN." The court has already found a substantial showing that CD Lab did not relinquish its right in the name "WINCAN" and that there was an unconditional promise to transfer the United States registration of the mark to CD Lab by WinCan America. To the extent that the argument is revisited in the context of evaluating the rights in the "WINCAN AMERICA" mark, we have considered anew all of the materials submitted on the issue. We conclude that no alteration of our prior findings is warranted.

> illuminating because in the response, CD Lab says thank you for your letter and promise not to sell these to anybody and thanks for your promise to transfer them to CD Lab as soon as legally possible in light of the progress of the registration through the system that was taking place at the time. CD Lab says, "This of course is in line with our understanding by which CD Lab is the lawful owner of these marks that you have been permitted to use as distributor of our products."

Transcript of Hearing ("Tr."), pp. 47-48.

This factual analysis is equally applicable to the "WINCAN AMERICA" mark, inasmuch as the letter promising transfer addressed the transfer of both registrations.

WinCan America contends that later communications evidence that the promise to transfer was not an unconditional promise, but rather an element of a larger business transaction. While later documents may indicate that some consideration was given to a big picture resolution addressing CD Lab's issues with WinCan America, there is nothing in those communications to suggest that the demand for transfer by CD Lab and the promise to transfer by WinCan America were anything other than absolute. Indeed, Cori Criss, President of WinCan America, stated contemporaneously with the promise that

> CDLab [sic] has also informed WCA we need to transfer the trademark of the name WinCan and WinCan America by January 31, 2008. This means that legally we need to change our company name by the end of the month. How do you expect and want this to be handled as this does put us out of business?...The harsh statement from CDLab [sic], however, makes it clear they do not want WCA's business...If it is no longer of interest to invest and take over WCA, please inform so that we can determine together a way to shut down this company and prevent any kind of lawsuits for WCA and CDLab [sic] and devastation of this market for CDLab [sic]. My goal for the last year has been to do this changeover or shutdown in a polite manner, but CDLab [sic] has made it clear that their plan is different by putting us out of business in a quick manner...

January 7, 2008 E-mail from Cori Criss to Martin Hien and Paul Woodhouse. We conclude that CD Lab will likely succeed on the merits in establishing that, at least as of January of 2008, WinCan America expected to and did promise to transfer any right it might have had in both the "WINCAN" and "WINCAN AMERICA" marks.

The contractual obligation aside, we further find a likelihood of success by CD Lab in establishing that WinCan America lacks any right to continue its use of "WINCAN AMERICA" as a service mark for "technical support services, namely surveying, classifying, emergency repair, maintenance, management and consulting in connection with the use of inspection software."[4]

The registration of the "WINCAN AMERICA" mark disclaims the term "AMERICA," as a geographical designation may not be claimed except in connect with the term "WINCAN." "WINCAN AMERICA" is a composite mark which has been used exclusively by WinCan America in connection with its sales and support of CD Lab's WinCan products. The predominant term in this mark is, of course, "WINCAN" which is likely to be proven to be owned by CD Lab. The undisputed evidence of record is that CD Lab severed its distributorship relationship with WinCan America for future sales of its products, and has sought to preclude any further use of the "WINCAN" mark, including in its trade name for sales and service of inspection software.

In 1995 after formulating a business plan to distribute CD Lab's KanaLiSa inspection software under the name "WinCan" in the United States, Tec-Trade International, the predecessor to WinCan America, began building a market for the software and its accompanying technical services. WinCan America was not formed until 2001 in a buyout of Tec-Trade. Thus the new company name dovetailed with the business operations – the sales, installation, and support of the WinCan software. Neither WinCan America nor its predecessor had a written distributorship agreement with CD Lab. In its brief, WinCan America states that

> Until relatively recently, WinCan America was the *de facto* exclusive reseller of WinCan software products in the U.S. In the course of their ongoing business relationship, WinCan America and CD Lab personnel had periodic discussions over the years concerning possible business arrangements, including among other possibilities, execution of a written exclusive distributorship agreement or CD Lab's

---

[4]This is the description contained in the registration for "WINCAN AMERICA" as a service mark. "WINCAN AMERICA" is also registered as a trademark for infrastructure inspection computer software. It appears that there is no assertion by WinCan America that it can use "WINCAN AMERICA" as a registered trademark for such computer software.

> purchase of WinCan America's business.  To date, none of those possibilities has come to fruition.

WinCan America's Mem. in Opp., p. 15.  Thus it is clear that WinCan America had no contractual protection from the business outcome herein.  Despite evidence that WinCan America did, indeed, build the U.S. market for the WinCan products, it gained no right in the "WINCAN" or "WINCAN AMERICA" marks thereby.  *Doeblers' Pennsylvania Hybrids, Inc. v. Doebler*, 442 F.3d 812 (3d Cir. 2006).

WinCan America seeks to continue utilizing the "WINCAN AMERICA" mark despite the fact that it now sells no WinCan products and services only those WinCan products it has already placed in the marketplace.  Moreover, it is selling its own software product which competes with the WinCan products.  It advertises its product with quotes from customers that the software "Runs in WinCan mode;" "Looks like WinCan;" "Imports/Exports to WinCan."  WinCan America calls its product "IT."  This name is prominently displayed in various advertising pieces with the "WINCAN AMERICA" mark.  The continued prominent appearance of "WINCAN" in the trade name coupled with (1) the fact that the bare name "IT" does not designate *any* origin of the software such that it would be readily apparent that "IT" is *not* a WinCan product, (2) it is marketed as software for "comprehensive infrastructure inspections," identical to the use for the WinCan software, and (3) that it is an "in-house" product offered by the same company who sold and serviced a number of versions of WinCan software, make it likely that "IT" may be thought to be a new version of the WinCan software.  Further, despite WinCan America's contention that this expensive product is purchased with all due customer care, CD Lab has come forward with some evidence that there has been actual confusion in the marketplace concerning the origin of "IT."

WinCan America focuses on the fact that it will lose its identity as a provider of technical support services for infrastructure inspection software, and the attendant goodwill in the infrastructure inspection market in the name "WinCan America."  It cannot be disputed, however,

that this identity came about specifically in connection with the authorized distribution of the WinCan software. The fact that the trade name came into existence some six years after the WinCan software was being sold in the United States by Tec-Trade supports this conclusion. The WinCan America name gained meaning as a result of the successful placement of the WinCan software. While this success was achieved through the efforts of WinCan America personnel, the installation/service aspect of the business cannot be divorced from the sale of the product itself for which the company is named. *See, Doebler Penn. Hybrids, supra.* WinCan America established its identity as a distributor and provider of technical support services for the trademarked WinCan software. WinCan America cannot therefore retain "WINCAN," the dominant and distinguishing element in its trade name, after the termination of the distributor relationship. *See, Hewlett-Packard Company v. Packard Press, Inc.*, 281 F.3d 1261 (Fed.Cir. 2002); *Estate of Beckwith v. Commissioner of Patents*, 252 U.S. 538 (1920).

For the reasons stated above, the court finds that there is a likelihood that CD Lab will succeed on the merits in establishing a likelihood of confusion as to the origin of WinCan America's in-house software product if it is permitted to continue selling and servicing it under the trade name "WinCan America." Were it permitted to continue, WinCan America would be able to do indirectly that which it may not do directly. While not selling the product as "WinCan IT," WinCan America, former *de facto* exclusive seller of WinCan v-7 and v-8, would be selling "IT." Under this scenario, "IT" could easily be presumed to be yet another WinCan product. WinCan America attempts to counter this conclusion by noting that it has taken steps to disabuse the public of the notion that "IT" is another version of the WinCan software. It has explained in textual notes in its advertising that it no longer distributes WinCan software but it supports it. It has described "IT" as an "in-house" product which WinCan America developed. We find that this "fine print" explanation does not dispel the overall impression of a relationship between "IT" and WinCan through WinCan

America's offering of the software. CD Lab is therefore entitled to preclude WinCan America from continuing to perpetuate this confusion.

We find that CD Lab can likely prove that WinCan America's use of either the "WINCAN" or "WINCAN AMERICA" mark in connection with its offering of its "IT" product and related services likely will cause confusion or mistake or deception as to the origin, sponsorship or approval of the "IT" software. *See*, 15 U.S.C. § 1125(a)(1). In assessing the need for injunctive relief, the court is directed to consider

> (1) the likelihood of CD Labs's success on the merits, which we have already determined is high;
>
> (2) whether the injunction will save CD Lab from irreparable injury which is normally presumed where likelihood of confusion is found;
>
> (3) whether the injunction will harm others; a factor which weighs against WinCan America in light of the ongoing changeover process necessitated by the dissolution of the distributor relationship; and
>
> (4) whether the public interest would be served by the injunction; a factor weighing in favor of CD Lab, to prevent further confusion while still permitting the servicing of the WinCan products. WinCan America need not cease its sales of "IT" nor its servicing of WinCan product owners. It would simply be precluded from conducting business under the WinCan America name or otherwise associating its product with the "WINCAN" mark.

*See, ie. International Longshoremen's Association v. Norfolk Southern Corp.*, 927 F.2d 900, 903 (6th Cir. 1991). The court will therefore grant the motion of CD Lab for a temporary restraining order. A separate order will be entered this date in accordance with this opinion.

**IT IS SO ORDERED.**