UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
AT LOUISVILLE

WINCAN AMERICA, INC.                                                                                                   PLAINTIFF

v.                                                  CIVIL ACTION NO. 3:09CV-103-S

CD LAB AG MULTIMEDIA SYSTEMS                              DEFENDANT

## **MEMORANDUM OPINION**

This matter is before the on motion of the defendant, CD Lab AG Multimedia Systems ("CD Lab"), for partial summary judgment (DN 49). CD Lab has moved for summary judgment on three of its counterclaims: (1) First Counterclaim for trademark infringement under 15 U.S.C. §1125(a)(1)(A); (2) Fifth Counterclaim for breach of contract; and (3) Seventh Counterclaim for breach of the covenant of good faith and fair dealing.

This action arose over the ownership and use of the registered trademarks "WINCAN" and "WINCAN AMERICA." The court will briefly outline the events underlying this lawsuit.[1]

CD Lab is a manufacturer and seller of inspection documentation software used in the planning, recording, evaluation, documentation, administration and archiving of pipe inspections. The software is sold through wholly-owned distributors in Europe, and authorized distributors in the United States. CD Labs also utilizes more than 100 authorized resellers in over 50 countries.

Cori Criss is the President, CEO, and majority shareholder of WinCan America, Inc. Prior to 1995, Criss was with a company known as Tec-Trade International, the predecessor company to

---

[1] Much of this narrative was taken from the court's earlier memorandum opinion issued on June 10, 2009 (DN 41) and various affidavits filed by the parties. All facts pertinent to the summary judgment motion are taken in the light most favorable to WinCan America, Inc., the non-moving party.

WinCan America. In 1995 after formulating a business plan to distribute CD Lab's KanaLiSa inspection software under the name "WinCan" in the United States, Tec-Trade International ("Tec-Trade") began building a market for the software and its accompanying technical services. WinCan America was formed in 2001 in a buyout of Tec-Trade. Thus the new company name dovetailed with the business operations of Tec-Trade – the sales, installation, and support of the WinCan software. Neither WinCan America nor its predecessor had a written distributorship agreement with CD Lab.

WinCan America continued over many years to sell the software in the United States, to adapt and service it in the field, and to provide training for its customers. In approximately 2002, CD Lab introduced WinCan v8 in the United States through the marketing efforts of WinCan America. There were numerous technical problems with WinCan v8 which required extensive servicing for WinCan America's customers. A deterioration of the relationship between WinCan America and CD Lab began and progressed. The particular details concerning the demise of the relationship are not pertinent to the issues presently before the court.

In 2005, WinCan America filed applications to register the marks "WINCAN" and "WINCAN AMERICA." CD Lab expressed its concern over this apparently unauthorized filing for trademark protection. WinCan America contends, and CD Lab acknowledges that there had been some mention between the parties about trademarks, but no evidence has been offered by WinCan to contradict the assertion of CD Lab President Alessandro Caldara that CD Lab did not authorize the 2005 filings. Indeed, Criss, has stated in her affidavit that the filings were a part of WinCan America's "business plan."

When questioned about the applications, Criss sent an e-mail to Paul Woodhouse of WinCan Europe which stated:

> WinCan America filed for trademark name "wincan" and "wincan america" rights in the u.s. WinCan America has not filed for copyright. Copyright is the code or ownership of the program.
> ...I see possible scenarios as follows:
>
> WinCan America finalizes trademark of the wincan and wincan america names. WinCan America then keeps selling the wincan product from CD Lab. We've been clear to customers all along that it's a cdlab [sic] product and cdlab [sic] could prove it at any time. CD Lab files for copyright of this name/product. WinCan America then owns the wincan name in the u.s. with the copyright belonging to cdlab [sic]. We only are concerned with the trademark name as it's the company name.
>
> WinCan America stops the trademark application. The wincan name is then available for anyone's use. CD Lab does/doesn't file for this? If cd lab doesn't, the wincan name is available for use by anyone and not protected at all. This means anyone can use the wincan name on their google registration, etc.
>
> CD Lab files for the wincan name trademark application. WinCan America then changes company name to be something else and becomes "other company" selling wincan product.
>
> All of the above work for us. Before stopping the application though I thought we should brainstorm on the possible outcomes and present them to Sandro. Suggestions, comments? I know he wants something done asap although we have plenty of time before its finalized so hopefully taking a day or two to brainstorm is okay...

08/30/05 Criss e-mail to Woodhouse.

CD Lab decided to permit the application process to proceed and to obtain transfer of the marks upon their issuance. Criss urged that "it doesn't make business sense to stop [the application [process] if our two companies are partnering together," and acknowledged that transfer could be done by "literally sell[ing] it to CD lab for $1 and it becomes yours...This would require trust on CD Lab's part but I think its valid to put the trust in WCA to do this. We have no 'designs' on the WinCan name." 09/03/05 Criss e-mail to Woodhouse.

On January 30 2008, Criss sent a letter to Woodhouse stating

> WCA has received Cd Lab's request to receive ownership of the WinCan and WCA trademark [sic]. This [sic] trademarks are officially in progress with the U.S. Trademark Office. WCA is on hold with transferring these trademarks until the Trademark Office reviews and accepts the Statements of Use. This can take up to one year. The latest date the Registration Certificates will be issued to WCA is July 31, 2008. WCA agrees not to sell these trademarks to any company other than CD Lab or CD Lab's assigned representative. WCA agrees to transfer the trade marks "WinCan" & "WinCan America" as soon as legally possible and understands that CD Lab will reimburse WCA for the full cost of the registration procedure.

January 30, 2008 Criss Letter to Woodhouse. On February 6, 2008, CD Lab sought confirmation, by letter, of the commitment of WinCan America to transfer the marks:

> Thank you for your letter of January 3[0], 2008 in which you confirmed, in particular, that WinCan America, currently registered as owner of our trademarks "WinCan" and "WinCan America," would not sell them to any other company and would transfer them to us as soon as legally possible in the US Trademarks Registry. This of course in line with our understanding by which CD Lab AG is the lawful owner of those trademarks that you have been permitted to use as a US distributor of our products.
>
> I confirm that we will reimburse WinCan America for its full effective cost for registering those trademarks, approximately US $10,000, once CD Lab AG has been registered as owner in the US Trademarks Registry and upon receipt of copies of the invoices you have paid to register the trademarks.
>
> Would you please sign a copy of this letter and return it to me by post at your earliest convenience.
>
> Sincerely,
>
> CD LAB AG
>
> //s// Alessandro Caldara, CEO

02/06/08 Caldara Letter to Criss. Criss returned a signed copy of the letter to CD Lab.

On December 30, 2008, Caldara sent a letter to Criss terminating WinCan America's distributorship rights for CD Lab products:

> Due to unbridgeable differences...in the assessment of the distribution, the technical requirements and support services of our products in the American market, we see ourselves compelled to terminate the collaboration with WinCan America effective immediately.
>
> ...[W]e demand the return or cancellation of the WinCan and WinCan America trademarks which were unlawfully registered by WinCan America in its own name by 31 January 2009, and we reserve the right, in the event of refusal, to undertake the necessary legal actions...

12/30/08 Caldara Letter to Criss.

In February of 2009, the marks still had not been transferred to CD Lab. WinCan America was attempting to stay afloat financially as the distribution channel for the WinCan software was moved to WinCan's competitor, Envirosight, LLC.

WinCan America sought financing from CD Lab for a booth at the Louisville Pumper & Cleaner International Environmental Expo ("Pumper Expo") scheduled to begin on February 25, 2009. CD Lab agreed to provide $20,000 "as a credit with CD Lab to offset product purchases." 02/15/09 Invoice. The invoice also noted "WCA needs to sell product." *Id*.

On February 23, 2009, WinCan America filed this trademark infringement action against CD Lab and two of WinCan America's competitors. Two days later, WinCan America filed a motion for a temporary restraining order seeking to prevent CD Lab, Envirosight, LLC and Rapidview, LLC[2] from using the "WINCAN" trademark. After an evidentiary hearing on the matter, the court denied the motion, finding that:

> Unusually in this case is that the plaintiff seems to have registered this mark without any assignment or other agreement from CD Lab....[I]n this letter, which of course does not by the way mention any such sale [of WinCan America to CD Lab], but in that WinCan America acknowledges CD Lab's request...– and this is the language – WinCan America agrees to transfer the trademarks, WinCan and WinCan America, as soon as legally possible and understands that CD Lab will reimburse WinCan

---

[2]Another competitor.

> America for the full cost of the registration procedure. That does not appear to be a conditional promise but an unconditional agreement to transfer...CD Lab says, "This of course is in line with our understanding by which CD Lab is the lawful owner of these marks that you have been permitted to use as distributor of our products." So it's pretty clear that CD Lab at that point did not have any cause to jump on the situation because it had an un conditional promise to transfer the marks...[A]s a sales feature [WinCan America] also contends that it adds value to the software through its abilities to configure the software to the various robots that might be using it and to tweak the software as necessary for such purposes from time to time, which is not uncommon in the software industry...So the question before the court really is...can WinCan USA [sic] exclude these other parties from...using this mark, WinCan, at the show? And that turns on whether CD Lab is the appropriate owner of these marks, regardless of the fact tht WinCan was the registrant...I'm going to conclude here that [WinCan America] has not shown a likelihood of success on the merits, that there is, despite the fact that it is the registrant of this mark, it is merely the distributor of the software here, a distributor. It...did not acquire the registration through the assignment or the permission of CD Lab that I'm told, that I'm informed about at this hearing, and that the stronger rights in this, from the information I have at this time, seem to be in the manufacture[r] of the product, which is ultimately responsible for its quality and its usefulness, despite the fact that the distributor assumes responsibility for tweaking as necessary during the installation process in the context of the sales that it may make. Finding that the plaintiff is not the proper owner of this mark, from what I have in front of me here, I'm finding that there is not a likelihood of success on the merits.

DN 21, Transcript, pp. 47-51.

At the Pumper Expo, WinCan America introduced its own "in house" software product, IT. WinCan America continued to identify itself by its business name. At that time, there was no apparent issue with WinCan America continuing to conduct its business. In fact, it had been represented at the TRO hearing that the only issue then before the court was the use of the "WINCAN" mark on software products. The court stated in its ruling that "we have...the plaintiff here, WinCan America, Inc., which is the registered owner of two marks, WinCan and WinCan America. Now, WinCan America is not in play at this point because the dispute arises over WinCan and its use." DN 21, Transcript, p. 46. Wincan America sought, albeit unsuccessfully, to preclude others from using the "WINCAN" mark by virtue of its registration of the mark in the United States.

After the court denied its motion for a TRO, WinCan America did not utilize the name "WinCan IT," but rather called its "in house" product "IT."

The WinCan America name and logo were prominently displayed in the booth at the Pumper Expo. At the event, WinCan America introduced its "in house" product. WinCan America had received CD Lab's agreement to fund a portion of the cost of its attendance at the Pumper Expo by giving WinCan America credit to offset product purchases. Thus WinCan America needed to sell WinCan v8 at the Expo. WinCan America contends that "[d]espite offering this new independent product, WinCan America continued to promote and attempt to sell WinCan v8 at the Pumper Show consistent with the agreement...That included demonstrations of v8 software and distribution of v8 and CD Lab literature." (Criss Affidavit, ¶ 47). CD Lab has offered evidence that at least one customer inquired of Envirosight whether it would be offering "WinCan's new IT software," thus evidencing some confusion over whether IT was a new version of the WinCan software.

Concerned that WinCan America's introduction of IT was causing confusion in the marketplace, CD Lab sought its own temporary restraining order to preclude WinCan America from using the "WINCAN" and "WINCAN AMERICA" marks. At the conclusion of the March 13, 2009 hearing on the motion, the court held the ruling in abeyance pending the briefing of the issue of whether WinCan America could be enjoined from using the word "WINCAN" in the identification of its business and of its own products as part of the "WINCAN AMERICA" mark. This issue had not been addressed in the parties' briefs.

The court concluded that CD Lab's motion for injunctive relief was moot with respect to the use of "WINCAN IT" as WinCan America stated that it was not and would not use that name. It also concluded that the issue was moot with respect to the stand-alone "WINCAN" mark, as WinCan

America stated that it was not using the stand-alone term except to sell and service CD Lab's product, which it was still authorized to do.

In a June 10, 2009 opinion, the court concluded that WinCan America's use of either the "WINCAN" or "WINCAN AMERICA" mark in connection with its offering of its "IT" product and related services would likely cause confusion or mistake or deception as to the origin, sponsorship or approval of the "IT" software, and granted CD Lab's motion for a temporary restraining order and preliminary injunction. DNs 41, 42.

Against this backdrop of events and rulings by the court, CD Lab now moves for summary judgment on its counterclaims for trademark infringement under 15 U.S.C. § 1125(a)(1)(A), breach of contract, and breach of the covenant of good faith and fair dealing.

A party moving for summary judgment has the burden of showing that there are no genuine issues of fact and that the movant is entitled to summary judgment as a matter of law. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 151-60, 90 S. Ct. 1598, 16 L. Ed. 2d 142 (1970); *Felix v. Young*, 536 F.2d 1126, 1134 (6th Cir. 1976). Not every factual dispute between the parties will prevent summary judgment. The disputed facts must be material. They must be facts which, under the substantive law governing the issue, might affect the outcome of the suit. *Anderson v. Liberty Lobby, Inc.*, 106 S. Ct. 2505, 2510 (1986). The dispute must also be genuine. The facts must be such that if they were proven at trial, a reasonable jury could return a verdict for the non-moving party. *Id.* at 2510. The disputed issue does not have to be resolved conclusively in favor of the non-moving party, but that party is required to present some significant probative evidence which makes it necessary to resolve the parties' differing versions of the dispute at trial. *First National Bank of Arizona v. Cities Service Co.*, 391 U.S. 253, 288-89 (1968). The evidence must be construed in a

light most favorable to the party opposing the motion. *Bohn Aluminum & Brass Corp. v. Storm King Corp.*, 303 F.2d 425 (6th Cir. 1962).

I.

CD Lab is entitled to judgment as a matter of law on its counterclaim for breach of contract (Fifth Counterclaim). WinCan America has come forward with nothing to call into question the original assessment of this court that the February 6, 2008 letter from Caldara to Criss, when countersigned by Criss, constituted an unconditional promise to transfer the "WINCAN" and "WINCAN AMERICA" marks to CD Lab. Caldara signed the letter setting out the understanding that CD Lab owned the marks. The letter set out the unconditional promise of WinCan America to transfer the marks as soon as legally possible. Caldera committed that CD Lab would pay the full cost of obtaining the registrations. Caldera requested that Criss sign a copy of the letter and return it. She did so. With this agreement in place, CD Lab did not oppose the applications. It is undisputed that demands for transfer of the marks were made, but that WinCan America has refused and continues to refuse to transfer them to CD Lab.

WinCan America makes much of the ongoing communications between the parties on various issues. We find it significant that nowhere in her communications with CD Lab did Criss assert that WinCan America owned the marks and therefore had the right to file registrations to protect its own intellectual property. At best, she proposed one "scenario" in which WinCan *could obtain* rightful ownership of the marks, if CD Lab agreed, and the applications were permitted to proceed without challenge. In that same communication, however, Criss noted other scenarios including (1) withdrawal of the applications, or (2) the registration of the marks by CD Lab,

requiring WinCan America to change its name. She stated at the conclusion of that communication that "all of the above [scenarios] work for us." 08/30/05 Criss e-mail to Woodhouse.

The fact that discussions occurred concerning a possible sale of WinCan America is irrelevant to the question of the validity of the contract to transfer the marks. Discussions over the sale of WinCan America did not yield fruit. The letter agreement makes no reference to any such discussions.

Under New Mexico law,[3] CD Lab must prove the existence of a contract, the breach of that contract, and damages caused by the breach. *Camino Real Mobile Home Park Partnership v. Wolfe*, 891 P.2d 1190, 1196 (N.M. 1995); *McGinnis v. Honeywell, Inc.*, 791 P.2d 452 (N.M. 1990). The terms of the contract are clear, unambiguous, and unconditional. There is evidence establishing an offer, acceptance, consideration, and mutual assent. *DeArmond v. Halliburton Energy Services, Inc.*, 81 P.3d 573, 577 (N.M.App. 2003). Criss stated the terms in her January 30, 2008 letter to Woodhouse, stating that "WCA agrees to transfer the trademarks "WinCan" and "WinCan America" as soon as legally possible and understands that CD Lab will reimburse WCA for the full cost of the registration procedure." Caldara's February 6, 2008 letter memorialized the promise to transfer marks. The letter included CD Labs' express assertion of ownership of the marks, and its agreement to reimburse WinCan America for registration expenses. Caldara acknowledged Criss' earlier communication in which she promised that WinCan America would transfer the marks. He affixed his signature. to his letter, and then requested that Criss also sign the agreement. The court finds that there is no genuine issue of material fact concerning the creation of a binding contract

---

[3]The parties agree that Kentucky choice of law rules mandate that the court apply the substantive law of the state with the most significant relationship to the contract, *(Papa John's International, Inc. v. Pizza Magia International, LLC*, 2001 WL 1789379, *2 (W.D.Ky. 2001)) which in this case is New Mexico. WinCan America against whom the contract is to be enforced has its principal place of business in New Mexico and it executed the contract and is alleged to have breached the contract there.

under these facts. There is no dispute that although CD Lab permitted the registration applications to proceed, WinCan has not transferred the marks as agreed. In fact, CD Lab has been forced into litigation over the marks and, to date, remains dispossessed of its intellectual property.

Summary judgment will be entered in favor of CD Lab on its Fifth Counterclaim for breach of contract.

II.

CD Lab's First Counterclaim alleges trademark infringement under 15 U.S.C. § 1125(a)(1)(A). For the reasons set forth below, the court concludes that genuine issues of material fact exist with respect to this claim and summary judgment must therefore be denied.

15 U.S.C. § 1125(a)(1)(A) states:

Any person who, on or in connection with any goods or services, or any container for goods, uses in commerce any word, term, name, symbol, or device, or any combination thereof, of any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which...is likely to cause confusion, or to cause mistake, or deceive as to affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person...shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act."

The court finds that a genuine issue of material fact exists with respect to the use in commerce of the "WINCAN" mark. CD Lab based this claim on the contention that WinCan America named its competing product "WinCan IT" and that it was using a logo to promote WinCan IT which is "essentially identical to" the logo for the WinCan software. Answer and Counterclaims, ¶¶ 63-71. CD Lab attached as Exhibit D a brochure for WinCan America's new product. A review

of the brochure establishes that the product is not called "WinCan IT."[4] It is called "IT." IT was introduced into the market by WinCan America at the Pumper Expo, an event at which WinCan America was also required to sell WinCan v8.

CD Lab contends that the use of the WinCan America company name and WinCan logo in proximity to this "in house" product fueled consumer confusion concerning the origin of IT. CD Lab has offered some evidence proving confusion. In fact, WinCan America itself asserted, in seeking a restraining order against CD Lab, that confusion was certainly inevitable should these companies promote competing products under the WinCan mark. *See,* WinCan America's Motion for TRO.

The issue is complicated by the fact that WinCan America was not, at the time of the Expo, restricted from using its company name and logo, and was, in fact, funded to sell CD Lab's WinCan v8 at the Expo. The court must thus evaluate the context in which WinCan America introduced its own "in house" product. WinCan America had been in the business of distributing and servicing CD Lab's WinCan software for many years. It developed a successful business as WinCan America in the market. CD Lab and WinCan America did not at any time have a written distributorship contract. The parties appeared to operate within the bounds of a mutually advantageous informal relationship until dissatisfaction developed between them, and CD Lab determined to utilize other distributors.

---

[4]On the third page there is one reference to "WinCan's I.T. Software Suite." This reference is close, but not identical to "WinCan IT." "WinCan's" indicates possession or ownership. However, WinCan America is referred to throughout the literature as "WinCan America" or "WCA." Therefore, despite the use of the possessive form, it appears that "WinCan's I.T. Software Suite" could be mistaken for a version or derivation of the WinCan software. It is unlcear, however, whether the brochure was disseminated in this form, as it was indicated that a number of changes were made to the advertising pieces.

CD Lab did not, however, cease doing business with WinCan America completely, as there were outstanding orders for the product and placements of the product in the field which needed to be serviced. Additionally, CD Lab sought to have WinCan America continue to promote its product in the United States, albeit under different terms. From WinCan America's perspective, it sought to remain a viable business with its reputation intact. To that end, it sought to remain "WinCan America," an effort in which it has ultimately been unsuccessful, despite its development of a successful business under that name. Adopted after Tec-Trade International had been selling the WinCan product for some time, the "WinCan America" name reflected the authorized distribution and service of CD Lab's WinCan product. WinCan America also sought to repair its relationship with Cd Lab, or to sell itself as a going concern. Neither effort was successful.

After having registered the marks without authorization, WinCan America sought to exercise rights under the registrations by filing suit to preclude its competitors and CD Lab from using the "WINCAN" mark. "WINCAN AMERICA" was not in issue at that time. The court noted that the dispute was over "WINCAN" and its use. DN 21, Transcript, pp. 46-51. WinCan America continued to use its company name and logo at the Pumper Expo, and was in fact, partially funded by CD Lab to promote the WinCan product.

CD Lab takes issue with the fact that WinCan America continued to identify itself as such, while introducing an "in house" product at the Expo. CD Lab contends that the product's name was "conspicuously absent" from WinCan America's advertising materials. This introduction, CD Lab urges, led to an assumption by consumers that the unnamed product was a version of the WinCan software.

However, CD Lab seeks here to "have its cake and eat it too." It wanted WinCan America to continue to promote and service its product. WinCan America, therefore, continued to conduct business under its representative business name, servicing customers, ordering product, and engaging in product promotion. It was present as WinCan America at the Pumper Expo, it utilized the logo, promoted its web address and other contact information, all without objection and with the objective of CD Lab that WinCan America would "sell product." The parties dispute whether WinCan America actually promoted or sold the WinCan software in satisfaction of the expectation of CD Lab.[5] It is undisputed, however, that WinCan v8 was loaded on the computers and that information about the product was available to visitors to the booth. WinCan America also promoted its "in-house" software, an activity that was not prohibited by any distribution agreement.

CD Lab takes issue with the mere proximity of the "in house" product to WinCan America's signage in the booth at the Pumper Expo. The problem is, however, that WinCan America was participating in the Expo with CD Lab's consent.

CD Lab counters that it certainly did not authorize WinCan America to participate so that it could compete with and trade off of its WinCan brand. Again, the competing product was not offered as "WinCan IT," as alleged in the counterclaim. CD Lab has not established that the display of the "IT" product in the WinCan America booth is equivalent to labeling the product "WinCan IT" so as to constitute unauthorized use of a mark under § 1125(a)(1(A). This is the only "use in commerce" referenced in the counterclaim.

In March of 2009, after CD Lab filed its counterclaims, the court heard CD Lab's motion for a temporary restraining order. As reflected by the memorandum of that hearing, even at that point

---

[5]This is the subject of the claim for breach of good faith and fair dealing which is discussed later in this opinion.

in time, the parties had not addressed whether WinCan America, who had used the "WINCAN AMERICA" exclusively in the United States in connection with its sales and service business, could be enjoined from using the word "WINCAN" in the identification of its business and its own products as part of the "WINCAN AMERICA" mark. The matter was then briefed and in June of 2009, the court determined that WinCan America should be enjoined with respect to the use of both the "WINCAN" and "WINCAN AMERICA" marks. Thus it was not until March of 2009, after the Pumper Expo, that the use of "WINCAN AMERICA" was placed in issue. The injunction prohibited WinCan America from using in commerce the "WINCAN" and "WINCAN AMERICA" marks, with the exception of required communications concerning WinCan software which has been provided for previously established sale or the installation or servicing of such software.

There is now a contention that the injunction has been violated by WinCan America, doing business as Infrastructure Technologies, LLC ("IT"). CD Lab has filed a motion seeking a show cause order why IT should not be held in contempt of the injunction order. (DN 69). This matter is not yet fully briefed. There is at least one allegation in CD Lab's motion that IT's competing product was referred to by a distributor as "WinCan IT."

For these reasons, summary judgment as to the First Counterclaim will be denied.


III.

The court will also deny the motion for summary judgment with respect to the Seventh Counterclaim for breach of the covenant of good faith and fair dealing. CD Lab notes that under both New Mexico and Kentucky law, a covenant of good faith and fair dealing runs with every contract. *See, Sanders v. FedEx Ground Packaging System*, 188 P.3d 1200, 1203 (N.M. 2008); *Ram*

*Engineering & Construction, Inc. v. University of Louisville*, 127 S.W. 3d 579, 585 (Ky. 2004). "The breach of this covenant requires a showing of bad faith or that one party wrongfully and intentionally used the contract to the detriment of the other party." *Sanders*, 188 P.3d at 1203.

We conclude that a genuine issue of material fact exists with respect to the agreement between the parties and with respect to the parties' performance under the agreement. The parties' agreement for funding for the Expo is not wholly clear. Woodhouse states in his affidavit that "CD Lab would credit [WinCan America] $20,000 toward operating a booth at the Louisville tradeshow to promote the WINCAN software." Woodhouse Aff., ¶ 3. The Invoice which contains the terms upon which the parties relied does not say anything about promotion. Rather, it states that CD Lab agreed that "this will be used as a 'credit' with CD Lab to offset product purchases, WCA needs to sell product." Criss stated in her affidavit that "WinCan America was to receive the credit only if and when WinCan America sold products it purchased from CD Lab." Criss Aff., ¶ 49. WinCan America had the WinCan v8 software loaded on the computers at the Expo, offered demonstrations of the v8 software and provided literature to potential customers. We do not find that the fact that WinCan America introduced a competing product necessarily establishes a breach of the duty of good faith. There is clearly a dispute of fact concerning the terms of the parties' agreement and what occurred at the Expo.

For these reasons, the motion for summary judgment as to the Seventh Counterclaim will be denied.

CD Lab has shown entitlement to summary judgment on its claim for breach of contract. Summary judgment must be denied as to the claims for violation of 15 U.S.C. § 1125(a)(1)(A) and

breach of the covenant of good faith and fair dealing. A separate order will be entered this date in accordance with this opinion.

**IT IS SO ORDERED.**